**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JEFFREY LY, derivatively on behalf of INTEL CORPORATION, | |
| Plaintiff, | C.A. No. |
| v. | **JURY TRIAL DEMANDED** |
| PAT GELSINGER, DAVID ZINSNER, JAMES GOETZ, ANDREA GOLDSMITH, ALYSSA HENRY, OMAR ISHRAK, RISA LAVIZZO-MOUREY, TSU-JAE KING LIU, BARBARA NOVICK, GREGORY SMITH, LIP-BU TAN, DION WEISLER, and FRANK YEARY, | |
| Defendants, | |
| and | |
| INTEL CORPORATION, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Jeffrey Ly ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Intel Corporation ("Intel" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Pat Gelsinger ("Gelsinger"), David Zinsner ("Zinsner"), James Goetz ("Goetz"), Andrea Goldsmith ("Goldsmith"), Alyssa Henry ("Henry"), Omar Ishrak ("Ishrak"), Risa Lavizzo-Mourey ("Lavizzo-Mourey"), Tsu-Jae King Liu ("Liu"), Barbara Novick ("Novick"), Gregory Smith ("Smith"), Lip-Bu Tan ("Tan"), Dion Weisler ("Weisler"), and Frank Yeary ("Yeary") (collectively, the "Individual Defendants," and together with Intel, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Intel, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and

violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Intel, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from January 25, 2024 through April 25, 2024, inclusive (the "Relevant Period").

2.      Intel is a Delaware corporation based in Santa Clara, California which designs, manufactures, and markets computing and technology products worldwide including semiconductor chips. Historically, Intel spent much of its existence manufacturing its own chips.

3.      On March 23, 2021, Intel Chief Executive Officer ("CEO") Defendant Gelsinger announced a Company reorganization vision dubbed "IDM 2.0,"[1] under which Intel would launch a contract chip-making arm, also known as a foundry business, separated from its chip design operations. In particular, the Company represented that it would now be operating through the following reportable segments: Client Computing Group, Data Center and AI, Network and Edge,

---

[1] Integrated Device Manufacturing ("IDM").

Mobileye, and Intel Foundry Services ("IFS"). Thereafter, on October 11, 2022, Defendant Gelsinger announced that Intel would be shifting to an "internal foundry model." This foundry arm was designed to operate as a chip-making business, taking orders from both its own Intel engineers as well as external chip design companies ("Intel Foundry"). Under Intel Foundry, the Company would recognize revenues generated from both external foundry customers and Intel Products, as well as technology development and product manufacturing costs historically allocated to Intel Products.

4.     On June 21, 2023, the Company announced relevant updates to Intel Foundry, stating that, effective the first quarter of 2024, Intel would implement a new financial reporting system under which Intel Foundry would be responsible for its own reportable profits and losses ("P&Ls"). The Company emphasized that the Intel Foundry reporting structure would improve cost saving and margin efficiencies and would provide beneficial tailwinds to IFS. However, despite these rosy representations and similar representations repeated throughout the Relevant Period, the reality was that the growth of IFS was not indicative of revenue growth reportable under Intel Foundry.

5.     The truth began to emerge on April 2, 2024 when the Company revealed, in a press release issued after the markets closed, a "retrospective revision to Item 7 of Intel Corporation's Annual Report on Form 10-K 'Management's Discussion and Analysis of Financial Condition and Results of Operations' for the year ended December 30, 2023, as originally filed with the SEC on January 26, 2024" ("April 2nd Press Release").

6.     In the April 2nd Press Release, the Company revealed that Intel Foundry's real operating losses were ***approximately $7 billion*** on sales of $18.9 billion for the 2023 Fiscal Year. Further, the Company revealed that Intel Foundry's internal revenue for the 2023 Fiscal Year was

$18.9 billion down $8.6 billion from 2022. These representations signaled to investors that there was a lower product profit driven by lower internal revenue.

7.      On this news, Intel's stock price fell by approximately 8.2% per share, or $3.61, from a closing price of $43.94 per share on April 2, 2024 to close at $40.33 per share on April 3, 2024, on unusually heavy trading.

8.      Further, on April 25, 2024, the Company released its first quarter 2024 financial results in a Form 10-Q filing with the SEC ("Q1 2024 10-Q") in which the Intel Foundry reported revenues of $4.4 billion, or a 10% decline compared to the same quarter the year prior.

9.      On this news, Intel's stock price fell by approximately 9.2% per share, or $3.23, from a closing price of $35.11 per share on April 25, 2024 to close at $31.88 per share on April 26, 2024, on unusually heavy trading.

10.     Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by making a series of materially false and misleading statements which failed to disclose, *inter alia*, that: (1) IFS's growth was not indicative of revenue growth reportable under the Intel Foundry segment; (2) Intel Foundry experienced substantial operating losses in 2023; (3) Intel Foundry experienced a decline in product profit driven by lower internal revenue; (4) due to the foregoing, Intel Foundry would not be a strong tailwind to Intel's IFS strategy; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

12.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

13.     In light of the Individual Defendants' misconduct—which has subjected the Company, its CEO, and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendant Gelsinger and Defendant Zinsner's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Intel's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claim raises a federal question under Section 14(a) of the Exchange Act (15 U.S.C. §

78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19.    Plaintiff is a current shareholder of Intel. Plaintiff has continuously held Intel common stock since first purchasing the stock on January 19, 2024.

### Nominal Defendant Intel

20.    Nominal Defendant Intel is a Delaware corporation with its principal executive offices located at 2200 Mission College Boulevard, Santa Clara, California 95054. Intel's shares trade on the NASDAQ under the ticker symbol "INTC."

### Defendant Gelsinger

21.    Defendant Gelsinger has served as the Company's CEO and as a Company director since February 2021. According to the Company's proxy statement filed on Schedule 14A with the SEC on March 28, 2024 (the "2024 Proxy Statement"), as of March 1, 2024, Defendant

Gelsinger beneficially owned 592,820 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $43.82, Defendant Gelsinger beneficially owned approximately $25,977,372 worth of Intel stock as of that date.

22.    For the 2023 Fiscal Year, Defendant Gelsinger received $16,855,400 in total compensation from the Company. This included $1,067,700 in salary, $12,426,800 in stock awards, $2,886,000 in non-equity incentive plan compensation, $112,000 in change in pension value and non-qualified deferred compensation earnings, and $362,900 in all other compensation.

23.    The Company's 2024 Proxy Statement stated the following about Defendant Gelsinger:

> As a seasoned industry veteran with over 40 years of experience in semiconductor, software, and cloud computing and data storage industries and in his role as our CEO, Mr. Gelsinger brings significant senior leadership, global, industry, human capital, sales, operating, business development and M&A, and public company board experience to the Board. Mr. Gelsinger has gained extensive operating and manufacturing, sales, emerging technologies, M&A, and information security experience from serving in a variety of senior management roles, including as CEO and COO, at leading multinational software, information security and computing companies like VMware and EMC. Having started his career at Intel, he has over 30 years of direct knowledge and experience in Intel's culture, business development, strategy, and growth. Mr. Gelsinger also brings human capital and technical experience from his various senior leadership roles.

**Defendant Zinsner**

24.    Defendant Zinsner has served as the Company's CFO since January 2022. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Zinsner beneficially owned 133,849 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $43.82, Defendant Zinsner beneficially owned approximately $5,865,263 worth of Intel stock as of that date.

25.    For the 2023 Fiscal Year, Defendant Zinsner received $8,456,900 in total compensation from the Company. This included $752,800 in salary, $6,334,400 in stock awards, $1,296,000 in non-equity incentive plan compensation, and $73,700 in all other compensation.

26.    The Company's website states the following about Defendant Zinsner:

David Zinsner is executive vice president and the chief financial officer (CFO) at Intel Corporation. He leads Intel's global finance organization, including finance, accounting and reporting, tax, treasury, internal audit and investor relations. Prior to joining Intel in January 2022, Zinsner was executive vice president and CFO at Micron Technology Inc. Earlier in his career, Zinsner served as president and chief operating officer at Affirmed Networks. He also served as senior vice president of finance and CFO at Analog Devices, and senior vice president and CFO at Intersil Corp.

**Defendant Goetz**

27.    Defendant Goetz has served as a Company director since November 2019. Defendant Goetz also serves as a member of the Talent and Compensation Committee and the M&A Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Goetz beneficially owned 213,606 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $43.82, Defendant Goetz beneficially owned approximately $9,360,215 worth of Intel stock as of that date.

28.    For the 2023 Fiscal Year, Defendant Goetz received $374,400 in total compensation from the Company, consisting entirely of stock awards.

29.    The Company's 2024 Proxy Statement stated the following about Defendant Goetz:

Mr. Goetz brings to the Board senior leadership, industry and information technology (IT), emerging technologies, business development, and cybersecurity experience from his experience as a partner of a venture capital firm, where he focuses on cloud, mobile, and enterprise technology investments, as well as providing guidance and counsel to a wide variety of internet and technology companies, and his prior work in networks, data security and storage, software, and manufacturing through various senior roles and other board experiences. He assembled and led a team that pioneered end-user performance management. Mr. Goetz's experience with internet and technology companies brings depth to the

Board in areas that are important to Intel's business as it moves from a CPU to a multi-architecture xPU company, from silicon to platforms, and from a traditional IDM to a new, modern IDM.

**Defendant Goldsmith**

30.    Defendant Goldsmith has served as a Company director since September 2021. She also serves as a member of the Audit & Finance Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Goldsmith beneficially owned 7,621 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $43.82, Defendant Goldsmith beneficially owned approximately $333,952 worth of Intel stock as of that date.

31.    For the 2023 Fiscal Year, Defendant Goldsmith received $297,600 in total compensation from the Company. This included $91,900 in fees earned or paid in cash and $205,700 in stock awards.

32.    The Company's 2024 Proxy Statement stated the following about Defendant Goldsmith:

> Dr. Goldsmith brings to the Board industry and technical, emerging technologies, business development, public company, and government/regulatory experience. She is an accomplished academic, engineer, and inventor with more than two decades of experience at Stanford and Princeton in the fields of electrical engineering and applied science, with highly acclaimed, foundational work in wireless communications. Her research, which focused on the fundamental performance limits of wireless systems, especially with regard to 5G wireless, the mobile Internet of Things (IoT), smart grid design, and the applications of communications and signal processing to biology and neuroscience, directly relates to Intel's data-centric business opportunities. As a Co-founder and Chief Technology Officer (CTO) of Plume WiFi and Quantenna Communications, Dr. Goldsmith gained valuable entrepreneurial, business development, and emerging technologies experience. She has significant public company board experience from her service with Medtronic and Castle Crown and is also an advocate for increased diversity in science, technology, engineering, and mathematics (STEM).

**Defendant Henry**

33.    Defendant Henry has served as a Company director since January 2020. She also serves as a member of the Talent and Compensation Committee and the M&A Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Henry beneficially owned 36,356 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024, was $43.82, Defendant Henry beneficially owned approximately $1,593,120 worth of Intel stock as of that date.

34.    For the 2023 Fiscal Year, Defendant Henry received $372,100 in total compensation from the Company, consisting entirely of stock awards.

35.    The Company's 2024 Proxy Statement stated the following about Defendant Henry:

> Alyssa Henry brings senior leadership, industry and IT, emerging technologies and business models, and information security expertise to the Board from executive experience at a mobile payment processing company, including overseeing its expansion into other technology services for small businesses, and by leading the software development segment of a multinational technology company that focuses on e-commerce, cloud computing, digital streaming, and artificial intelligence. Alyssa Henry's more than 25 years of experience in software engineering and development of database and storage technologies is particularly useful to the Board as Intel moves from a PC-centric to a data-centric company and into the next phase of our IDM 2.0 strategy.

**Defendant Ishrak**

36.    Defendant Ishrak has served as a Company director since March 2017. He also serves as a member of the Audit & Finance Committee and as a member of the Corporate Governance and Nominating Committee and formerly served as the Chair of the Board from January 2020 until January 2023. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Ishrak beneficially owned 54,858 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was

$43.82, Defendant Ishrak beneficially owned approximately $2,403,878 worth of Intel stock as of that date.

37.    For the 2023 Fiscal Year, Defendant Ishrak received $339,700 in total compensation from the Company. This included $132,000 in fees earned or paid in cash, $205,700 in stock awards, and $2,000 in all other compensation.

38.    The Company's 2024 Proxy Statement stated the following about Defendant Ishrak:

> Dr. Ishrak brings senior leadership, operating and manufacturing, and international expertise to the Board from his position as former Chairman and CEO of Medtronic and his long history of success as a global executive in the medical technology industry. From his CEO roles at Medtronic and GE Healthcare, Dr. Ishrak has extensive experience identifying and developing emerging technologies and has overseen a number of strategic acquisitions, enabling him to bring business development and M&A experience to the Board. Earlier in his career, Dr. Ishrak held various product development and engineering positions at Diasonics Vingmed and Philips Ultrasound. Dr. Ishrak also provides technical, human capital, and brand marketing expertise from his role as a leader of a global medical technology company.

**Defendant Lavizzo-Mourey**

39.    Defendant Lavizzo-Mourey has served as a Company director since March 2018. She also serves as a member of the Talent and Compensation Committee and as the Chair of the Corporate Governance and Nominating Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Lavizzo-Mourey beneficially owned 28,766 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $43.82, Defendant Lavizzo-Mourey beneficially owned approximately $1,260,526 worth of Intel stock as of that date.

40.     For the 2023 Fiscal Year, Defendant Lavizzo-Mourey received $327,600 in total compensation from the Company. This included $121,900 in fees earned or paid in cash and $205,700 in stock awards.

41.     The Company's 2024 Proxy Statement stated the following about Defendant Lavizzo-Mourey:

> Dr. Lavizzo-Mourey brings senior leadership, strategy, and human capital and talent development expertise to the Board from her leadership of the largest public health philanthropic organization in the US for almost 15 years and, before that, her 15 years of service as a distinguished professor and administrator at the University of Pennsylvania. She also brings to the Board government experience from her roles serving as Deputy Administrator of the Agency for Health Care Research and Quality and as a member of the White House Health Care Reform Task Force. Dr. Lavizzo-Mourey's board service with other public companies also provides insights into board and governance best practices.

### Defendant Liu

42.     Defendant Liu has served as a Company director since July 2016. She also serves as a member of the Corporate Governance and Nominating Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Liu beneficially owned 27,472 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $43.82, Defendant Liu beneficially owned approximately $1,203,823 worth of Intel stock as of that date.

43.     For the 2023 Fiscal Year, Defendant Liu received $282,600 in total compensation from the Company. This included $76,900 in fees earned or paid in cash and $205,700 in stock awards.

44.     The Company's 2024 Proxy Statement stated the following about Defendant Liu:

> As a scholar and educator in the field of semiconductor logic and memory devices, who conducts research on advanced materials, process technology, and solid-state devices for energy-efficient electronics, Dr. Liu brings to the Board industry and technical experience directly related to Intel's semiconductor device research and

development and manufacturing. As a Co-founder of Progressant Technologies, which was later acquired by Synopsys, Inc., and while serving on technical advisory boards for multiple start-up companies, Dr. Liu gained business development experience. Her inventions and contributions to the fin-shaped field-effect transistor design, dubbed "FinFET," have given Dr. Liu extensive experience in semiconductors and emerging technologies. She also brings global and international experience to the Board with her work on establishing strategic international partnerships and agreements for UC Berkeley.

**Defendant Novick**

45.    Defendant Novick has served as a Company director since December 2022. She also serves as a member of the Audit & Finance Committee and as a member of the Corporate Governance and Nominating Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Novick beneficially owned 3,174 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $43.82, Defendant Novick beneficially owned approximately $139,085 worth of Intel stock as of that date.

46.    For the 2023 Fiscal Year, Defendant Novick received $389,600 in total compensation from the Company. This included $387,600 in stock awards and $2,000 in all other compensation.

47.    The Company's 2024 Proxy Statement stated the following about Defendant Novick:

> Ms. Novick brings to the Board a deep understanding of the needs and perspectives of investors gained during her more than 30-year career at BlackRock. Ms. Novick also brings to the Board senior leadership, global sales, and public policy experience, having served on the Global Executive Committee, created and led the Global Account Management Group for all client segments, and established and led the Global Government Relations and Public Policy Group to provide a voice for investors. Ms. Novick has substantial human capital experience and extensive expertise unlocking stockholder value from having helped grow BlackRock into one of the world's largest asset management companies. Ms. Novick's experience as head of BlackRock's Global Investment Stewardship Group also provides insight into matters relating to corporate governance and stockholder engagement.

**Defendant Smith**

48.     Defendant Smith has served as a Company director since March 2017. He also serves as the Chair of the Audit & Finance Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Smith beneficially owned 34,162 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $43.82, Defendant Smith beneficially owned approximately $1,496,979 worth of Intel stock as of that date.

49.     For the 2023 Fiscal Year, Defendant Smith received $319,600 in total compensation from the Company. This included $111,900 in fees earned or paid in cash, $205,700 in stock awards, and $2,000 in all other compensation.

50.     The Company's 2024 Proxy Statement stated the following about Defendant Smith:

Mr. G. Smith brings to the Board senior leadership, financial, strategic, operational, human capital, and global expertise from his experience as Executive Vice President and CFO of the world's largest aerospace company, with responsibility for the company's Enterprise Operations, Finance, Strategy, and Shared Services organizations. He led the company's global financing arm, Boeing Capital, its corporate audit function, and its environmental, social and governance work. Mr. G. Smith also held a number of other key leadership roles, including Vice President of Finance, Corporate Controller and Chief Accounting Officer, and Vice President of Financial Planning and Analysis. In between his two stints at Boeing, he spent four years at Raytheon Company as Vice President of Investor Relations. Mr. G. Smith brings substantial international and business development experience to the Board from his enterprise performance and strategy role at Boeing. Mr. G. Smith's portfolio also included Boeing HorizonX, the venture capital arm of Boeing that identifies and invests in start-ups that are developing emerging technologies and businesses in markets such as cybersecurity, AI and machine learning, and autonomous systems, among others. He also has experience in dealing with foreign governments, including on issues related to market access and the regulation of business and investment. Mr. G. Smith also brings operational experience to the Board, by overseeing Boeing's manufacturing, operations, supply chain, quality and program management teams.

**Defendant Tan**

51.     Defendant Tan has served as a Company director since September 2022. He also serves as a member of the M&A Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Tan beneficially owned 172,803 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $43.82, Defendant Tan beneficially owned approximately $7,572,227 worth of Intel stock as of that date.

52.     For the 2023 Fiscal Year, Defendant Tan received $791,500 in total compensation from the Company, consisting entirely of stock awards.

53.     The Company's 2024 Proxy Statement stated the following about Defendant Tan:

Mr. Tan served for 12 years as the CEO of Cadence Design Systems, a computational software company providing solutions used to design and develop complex semiconductor chips and electronic systems. He is also the founder and chairman of an international, venture capital firm and the founding managing partner of two other funds. Mr. Tan brings to the Board senior leadership, global/ international, deep industry and IT/technical, financial and investment expertise, human capital, sales and marketing, emerging technologies and business models, business development and M&A and substantial public company experience that provides insights into board best practices.

**Defendant Weisler**

54.     Defendant Weisler has served as a Company director since June 2020. He also serves as a member of the M&A Committee and as the Chair of the Talent and Compensation Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Weisler beneficially owned 38,043 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $43.82, Defendant Weisler beneficially owned approximately $1,667,044 worth of Intel stock as of that date.

55.     For the 2023 Fiscal Year, Defendant Weisler received $409,500 in total compensation from the Company, consisting entirely of stock awards.

56.    The Company's 2024 Proxy Statement stated the following about Defendant Weisler:

> Mr. Weisler brings to the Board senior leadership, global/international, industry and information technology (IT), operating and manufacturing, emerging technologies, and cybersecurity experience from his more than 25 years of experience in the IT industry. From his role as the CEO of one of the world's largest technology companies, Mr. Weisler also has financial expertise and extensive experience managing human capital and executing a business development and M&A strategy. Mr. Weisler also brings valuable governance and board-level experience from his years of service on the boards of multinational companies like HP, Thermo Fisher Scientific, and the BHP Group.

**<u>Defendant Yeary</u>**

57.    Defendant Yeary has served as a Company director since March 2009. He has also served as the Chair of the Board since January 2023 and serves as a member of the Corporate Governance and Nominating Committee and as Chair of the M&A Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Yeary beneficially owned 84,411 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $43.82, Defendant Yeary beneficially owned approximately $3,698,890 worth of Intel stock as of that date.

58.    For the 2023 Fiscal Year, Defendant Yeary received $452,100 in total compensation from the Company. This included $246,400 in fees earned or paid in cash and $205,700 in stock awards.

59.    The Company's 2024 Proxy Statement stated the following about Defendant Yeary:

> Mr. Yeary's career in investment banking brings to the Board financial strategy and global M&A expertise, including expertise in financial reporting, experience in assessing the efficacy of M&A on a global scale, and experience attracting and retaining strong senior leaders. At Darwin Capital Advisors, Mr. Yeary has evaluated, invested in, and served as a board member for numerous venture stage companies, giving him firsthand experience identifying and developing effective business models. Mr. Yeary's experience as Co-founder and Executive Chairman of CamberView Partners and his service on the board of PayPal provide insight into

matters relating to corporate governance, stockholder engagement, and board best practices. As Vice Chancellor of a large public research university, where he oversaw changes to the university's financial and operating strategy, Mr. Yeary gained extensive strategic, operational, and financial expertise.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

60.    By reason of their positions as officers and/or directors of Intel, and because of their ability to control the business and corporate affairs of Intel, the Individual Defendants owed Intel and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Intel in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Intel and its shareholders so as to benefit all shareholders equally.

61.    Each director and officer of the Company owes to Intel and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Intel, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

63.    To discharge their duties, the officers and directors of Intel were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and/or officers of Intel, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

65.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

66.    To discharge their duties, the officers and directors of Intel were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Intel were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Intel's own Code of Conduct (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Intel conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Intel and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Intel's operations would comply with all applicable laws and Intel's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67.    Each of the Individual Defendants further owed to Intel and the shareholders the duty of loyalty requiring that each favor Intel's interest and that of its shareholders over their own

while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

68.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Intel and were at all times acting within the course and scope of such agency.

69.    Because of their advisory, executive, managerial, and directorial positions with Intel, each of the Individual Defendants had access to adverse, non-public information about the Company.

70.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Intel.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

72.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

73.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material

facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Intel was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

74.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

75.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Intel, and was at all times acting within the course and scope of such agency.

## INTEL'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### Intel Code of Conduct

76.    Intel's Code of Conduct starts by stating that: "At Intel we are committed to building leadership products that delight our customers in every category in which we compete. To achieve our goals, we must execute with discipline, operate with urgency, and act with transparency, honesty, and integrity in every aspect of our business."

77.    The Code of Conduct continues, "[t]he Intel Code of Conduct…applies to every employee, members of the Intel Board of Directors, and employees of Intel subsidiaries…. The Code also applies to contingent workers, independent contractors, consultants, suppliers, and

others who do business with Intel. All Intel employees are responsible for knowing and following the Code."

78.    The Code of Conduct provides, under the heading "Maintain Accurate Records," that:

> We ensure Intel's books and records are complete, fair, accurate, timely, and reflect our operations and business activities. This includes internal management reporting as well as external reporting, such as our public statements, statutory filings, and filings with the US Securities and Exchange Commission. We do not support or condone preparing false records.

79.    The Code of Conduct provides, under the heading "Manage Conflicts of Interest and the Perception of Conflicts," that:

> A conflict of interest can arise when your personal, outside business, or family interests interfere or appear to interfere with your ability to make sound business decisions in the best interest of Intel.
>
> - **Actual Conflict of Interest**: An actual conflict exists when your personal interest and professional responsibility at Intel conflict, including your ability to remain objective in your Intel role.
>
> - **Perceived Conflict of Interest**: A perceived conflict exists when it appears your personal interests may compromise carrying out your professional responsibility at Intel in an objective manner.
>
> We seek to avoid any activity that is a conflict of interest or has the appearance of a conflict of interest with Intel.
>
> To manage a conflict of interest or perceived conflict, promptly disclose the matter in writing to your manager, who can assess the situation and seek help from Legal, if needed to resolve it. Directors and executive officers may disclose potential conflicts to Intel's Chief Legal Officer, Chief Compliance Officer, or Board of Directors.

80.    The Code of Conduct provides, under the heading "Comply with Trade Laws," that:

> We comply with all international trade laws and relevant requirements when providing our technology, products, and services to customers around the world. These regulations are complex and may restrict us from doing business with certain jurisdictions, entities, and individuals. We must comply with all applicable laws and obtain any necessary government authorizations.

81.     The Code of Conduct provides, under the heading "Protect Confidential Information," that:

> Confidential information gives Intel a competitive advantage, helps maintain the trust of our customers, and sustains the solid reputation on which Intel was built. You must protect Intel's confidential information as well as the confidential information of our customers and business partners. Disclosure of confidential information requires a clear business need and authorization.

82.     The Code of Conduct provides, under the heading "Compete Vigorously and Lawfully," the following, in relevant part:

> Antitrust laws encourage free competition by prohibiting certain agreements and conduct that make it more difficult for companies to compete…. To that end, we:
>
> • Truthfully communicate about our products and our competitors' products.

83.     The Code of Conduct provides, under the heading "Protect Physical Assets," that:

> Intel's physical assets include facilities, company funds, equipment, scrap material or obsolete equipment, and computer and communications systems. You must treat Intel's physical assets with care and use them primarily for Intel business[.]
>
> It is your responsibility to protect the company's physical assets from theft, loss, damage, and misuse, including unauthorized access.

84.     The Code of Conduct provides, under the heading "Accurately Communicate with the Public," the following, in relevant part:

> As a public company, we must follow regulations that govern public communications to investors and the public, including making timely disclosures in the financial reports and documents we submit to the US Securities and Exchange Commission and in other public communications.
>
> We are committed to communicating with the public in an accurate, reliable, and transparent manner. In external communications (including posting on the Internet through social media applications and websites), you must not give the impression that you are speaking on behalf of Intel unless you are authorized to do so. Only authorized spokespersons may make public statements on behalf of Intel to the media or investors.

85.     The Code of Conduct provides, as to "Market Accurately," that:

We represent Intel products and services fairly and accurately.

We do not use misleading or false statements in advertising or sales materials when marketing Intel's products and services, nor do we make illegal or untruthful claims about competitors or their products and services.

### Audit Committee Charter

86.    The Intel Audit & Finance Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit & Finance Committee.

87.    Per the Audit Committee Charter, the purpose of the Audit Committee is to "assist the Board's oversight of the Company's accounting and financial reporting processes and the audits of the Company's financial statements."

88.    The Audit Committee Charter lists, among the Audit Committee's responsibilities under the heading "Independent Auditor Oversight," the following, in relevant part:

1. The Committee is directly responsible for the appointment, replacement, compensation, retention and oversight of the work of the independent auditor. The independent auditor shall report directly to the Committee.

2. The Committee obtains and reviews annually a report by the independent auditor describing the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, peer review, Public Company Accounting Oversight Board ("PCAOB") inspection, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues.

3. Consistent with the applicable requirements of the PCAOB, the Committee reviews and discusses with the independent auditor the written statement from the independent auditor concerning any relationship between the auditor and the company or any other relationships that may adversely affect the independence of the auditor, and based on such review, assesses the independence of the auditor.

4. The Committee preapproves all auditing services and permissible non-audit services (including the fees and terms thereof) to be performed by the independent auditor. The Committee may, in its discretion, delegate to one or more of its members the authority to preapprove any audit or non-audit services to be performed by the independent auditor, provided that any such approvals are presented to the Committee at its next scheduled meeting.

5. The Committee reviews and discusses with the independent auditor: (a) its audit plans, and audit procedures, including the scope, fees and timing of the audit; (b) the results of the annual audit examination and accompanying management letters; (c) all critical audit matters ("CAMs") proposed by the independent auditor to be included in the independent auditor's annual audit report, and (d) the results of the independent auditor's procedures with respect to interim periods.

6. The Committee reviews and discusses reports from the independent auditor on (a) all critical accounting policies and practices used by the company, (b) alternative accounting treatments within GAAP related to material items that have been discussed with management, including the ramifications of the use of the alternative treatments and the treatment preferred by the independent auditor, and (c) other material written communications between the independent auditor and management.

7. The Committee reviews and discusses with the independent auditor the independent auditor's judgments as to the quality, not just the acceptability, of the company's accounting principles and such further matters as the independent auditors present the Committee under generally accepted auditing standards, and all communications that the independent auditor is required to give to the Committee.

8. The Committee reviews and discusses with management and the independent auditor various topics and events that may have significant financial impact on the company or that are the subject of discussions between management and the independent auditors.

9. The Committee periodically reviews and discusses with the independent auditor: (i) any disagreements between management and the auditor in connection with any audits; (ii) any difficulties the independent auditor encountered in the course of the audits, including any restrictions on the scope of their work or access to required records, data, and information; any changes required in scope or access to required information; and (iii) management's responses to such matters.

10. The Committee reviews and discusses with management and the independent auditor the timing and process for implementing the rotation of the lead audit partner and the reviewing partner, which rotation must occur not less than once every five years.

11. The Committee reviews the use of auditors other than the independent auditor in cases such as management's request for second opinions.

*          *          *

13. The Committee reviews and discusses with management and the independent auditor significant findings of any examination by regulatory authorities or agencies in the areas of securities, accounting, or tax, such as by the SEC or the U.S. Internal Revenue Service.

14. The Committee reviews and discusses with management, the independent auditor, and the company's chief audit executive: (a) the adequacy and effectiveness of the company's internal controls (including any significant deficiencies or material weaknesses) and significant changes in internal controls reported to the Committee by the independent auditor or management; (b) the company's internal audit procedures; and (c) the adequacy and effectiveness of the company's controls and procedures, and management reports thereon.

89.     The Audit Committee Charter states under the heading "Financial Reporting Oversight," that, regarding quarterly financial statements and financial reporting, the duties and responsibilities of the Audit Committee are as follows:

1. The Committee discusses with management and the independent auditor quarterly earnings press releases, including the interim financial information and Business Outlook included therein, any "pro forma" or non-GAAP financial measures set forth in the company's quarterly earnings press releases, quarterly financial statements and presentations relating thereto, and reviews the year-end audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and recommends to the Board of Directors whether the audited financial statements should be included in the Annual Report on Form 10-K for the year.

2. The Committee publishes the report of the Committee required by the rules of the Securities and Exchange Commission to be included in the company's annual proxy statement.

90.     The Audit Committee Charter states under the heading "Enterprise Risk Management Oversight," that: "[t]he Committee reviews and discusses with management the company's major financial, product security, and cybersecurity risk exposures and the steps management has taken to monitor and control such exposures, and management's annual enterprise risk management assessment."

91.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue

26

materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report known violations of the Code of Conduct and law.

92.     Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

93.     Intel is a Delaware corporation based in Santa Clara, California which designs, manufactures, and markets computing and technology products worldwide including semiconductor chips. Historically, Intel spent much of its existence manufacturing its own chips.

94.     On March 23, 2021, Intel Chief Executive Officer ("CEO") Defendant Gelsinger announced a Company reorganization vision dubbed "IDM 2.0,"[2] under which Intel would launch a contract chip-making arm, also known as a foundry business, separated from its chip design operations. In particular, the Company represented that it would now be operating through the following reportable segments: Client Computing Group, Data Center and AI, Network and Edge, Mobileye, and IFS. Thereafter, on October 11, 2022, Defendant Gelsinger announced that Intel would be shifting to an "internal foundry model." This foundry arm, Intel Foundry, was designed to operate as a chip-making business, taking orders from both its own Intel engineers as well as external chip design companies. Under Intel Foundry, the Company would recognize revenues generated from both external foundry customers and Intel Products, as well as technology development and product manufacturing costs historically allocated to Intel Products.

95.     On June 21, 2023, the Company announced relevant updates to Intel Foundry, stating that, effective the first quarter of 2024, Intel would implement a new financial reporting system under which Intel Foundry would be responsible for its own reportable profits and losses ("P&Ls"). The Company emphasized that the Intel Foundry reporting structure would improve cost saving and margin efficiencies and would provide beneficial tailwinds to IFS.

## False and Misleading Statements

### January 25, 2024 Press Release

96.     On January 25, 2024, Intel released a press release announcing its fourth quarter 2023 and 2023 Fiscal Year financial results ("January 25th Press Release"). In the press release, Defendant Zinsner stated, with regard to Intel Foundry's growth strategy, that "our new internal foundry model… is designed to drive greater transparency and accountability and higher returns

---

[2] Integrated Device Manufacturing ("IDM").

on our owners' capital." In relevant part, the January 25th Press Release included the following

chart:

| Business Unit Revenue and Trends | Q4 2023 | vs. Q4 2022 | 2023 | vs. 2022 |
|---|---|---|---|---|
| Client Computing Group (CCG) | $8.8 billion | up 33% | $29.3 billion | down 8% |
| Data Center and AI (DCAI) | $4.0 billion | down 10% | $15.5 billion | down 20% |
| Network and Edge (NEX) | $1.5 billion | down 24% | $5.8 billion | down 31% |
| Mobileye | $637 million | up 13% | $2.1 billion | up 11% |
| Intel Foundry Services (IFS) | $291 million | up 63% | $952 million | up 103% |

97.    The January 25th Press Release contained the following comment from Company

CFO Defendant Zisner:

> We continued to drive operational efficiencies in the fourth quarter, and
> comfortably achieved our commitment to deliver $3 billion in cost savings in 2023.
> **_We expect to unlock further efficiencies in 2024 and beyond as we implement our
> new internal foundry model, which is designed to drive greater transparency and
> accountability and higher returns on our owners' capital._**

(Emphasis added.)

98.    Defendant Gelsinger addressed the 2023 Fiscal Year financial results, albeit

inaccurately, stating, "We delivered strong Q4 results, surpassing expectations for the fourth

consecutive quarter with revenue at the higher end of our guidance."

99.    The January 25th Press Release reported Intel Foundry's revenue as $291 million

for the fourth quarter of 2023, "up 63%" compared to the fourth quarter of 2022, and $952 million

for the 2023 Fiscal Year, "up 103%" from 2022.

### _January 25, 2024 Conference Call_

100.    The same day, Intel hosted a conference call to discuss its fourth quarter and 2023

Fiscal Year financial results ("January 25th Conference Call"). In prepared remarks, Defendant

Gelsinger stated the following, in relevant part:

> [W]e expect sequential and year-on-year (YoY) growth in both revenue and EPS
> for each quarter of fiscal year (FY) 2024. Momentum and excitement around new
> products and businesses remains strong as we head into the year and will grow
> stronger as the year progresses.
>                          *              *              *

Third-party engagements with IFS (Intel Foundry Services) continue to validate our progress on process technology. We launched IFS with a long-term view of delivering the world's first system foundry that brings together a secure and sustainable supply chain with the best of Intel and our ecosystem. While our ambitions will not materialize overnight, ***we made tremendous progress in both Q4 and fiscal year '23 towards our goal of becoming the second-largest external foundry by 2030. The rapid adoption of AI by all industries is proving to be a significant tailwind for IFS as high-performance compute***, an area where we have considerable wafer and packaging know-how and IP (intellectual property), is now one of the largest and fastest growing segments of the semiconductor market.

                    *            *            *

Our success with IFS will be measured by customer commitments and revenue. We have taped out more than 75 ecosystem and customer test chips. IFS already has more than 50 test chips in the pipeline across 2024 and 2025, 75% of which are on Intel 18A.

                    *            *            *

The momentum in advanced packaging is very strong and is another facet of our foundry strategy, which is clearly benefitting from the surge of interest in AI (artificial intelligence). With leadership technology and available capacity, our opportunity set continues to grow.

In total, across wafer and advanced packaging, ***our lifetime-deal value for IFS is now over $10 billion, more than doubling from the $4 billion we provided in our last update.***

                    *            *            *

Finally, ***underpinning our across-the-board progress in 2023 is our operational and financial discipline. As our new internal foundry model, which is designed to drive greater transparency, accountability and focus on costs, begins to take root, we expect to unlock further cost savings and efficiencies in 2024 and beyond***. We have officially transitioned to this new operating model on January 1st and will report the new segmentation format as part of our Q1 earnings. We see incremental efficiencies as we drive to our long-term model of 60% gross and 40% operating margins.

(Emphasis added.)

101.    Intel also provided an investor presentation during the January 25th Conference Call, wherein Defendants represented that Intel Foundry had "Operational Efficiencies >$3B in FY'23, Internal Foundry Model[,]" as represented in the following chart:



*January 26, 2024 Form 10-K*

102.    On January 26, 2024, Intel filed the 2023 10-K with the SEC, which was signed by Defendants Gelsinger, Zinsner, Goetz, Goldsmith, Henry, Ishrak, Lavizzo-Mourey, Liu, Novick, Smith, Tan, Weisler, and Yeary. The 2023 10-K also contained certifications signed by Defendants Gelsinger and Zinsner, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the accuracy of the financial statements contained in the 2023 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

103.    The 2023 10-K continued to tout Intel Foundry's growth strategy, as well as the segment's financial performance, representing the following, in relevant part:

> We believe the Open System Foundry model delivers differentiated capabilities to help our customers lead in their industries while bringing stability to the global semiconductor supply chain. ***The momentum and customer commitments we are***

*seeing demonstrate that our strategy and offerings are resonating, and we look to build on this success in 2024 and in future periods*.



(Emphasis added.)

### *March 6, 2024 Morgan Stanley Technology, Media & Telecom Conference*

104.     On March 6, 2024, Defendant Zinsner spoke on behalf of Intel at the Morgan Stanley Technology, Media & Telecom Conference to discuss Intel Foundry. Defendant Zinsner stated, in pertinent part, that, "it's a significant tailwind to the earnings of the company," referring to Intel Foundry.

105.     Additionally, Defendant Zinsner touted:

> We can be profitable, meaningfully profitable in the foundry space, be well underneath what the leading player in the space is, and ***still drive significant profitability for the overall Intel company because we get the margin stacking benefit in at least the part of the business that we sell into our own fabless portion of our business.*** So that's really the way I kind of think about it. And I think the last piece of this is kind of restructuring how we manage the business. So we look at the entire manufacturing and TD footprint as a separate P&L and kind of manage the company accordingly to that. And I think we'll start to see a lot of the efficiencies that we think we can yield and get ourselves more competitive from a cost structure from managing the business in that way.

(Emphasis added.)

### *March 28, 2024 Annual Report Prefatory Letter[3]*

---

[3] The prefatory letter can be found on Intel's company website at the following URL: https://www.intc.com/filings-reports/annual-reports/content/0000050863-24-000055/0000050863-24-000055.pdf

106.    On March 28, 2024, the Company published its Annual Report to Security Holders, which included a prefatory letter from Defendant Gelsinger which stated the following, in relevant part:

> While still early in our foundry journey, we are seeing significant traction. We began 2023 with a commitment from one Intel 18A foundry customer and ended the year with four. We also achieved five advanced packaging wins, a testament to the advantages of Intel Foundry. To support the growing demand for our foundry offering, we continued to expand our manufacturing capacity and capabilities.

107.    The statements referenced above in ¶¶ 96-106 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) IFS's growth was not indicative of revenue growth reportable under the Intel Foundry segment; (2) Intel Foundry experienced substantial operating losses in 2023; (3) Intel Foundry experienced a decline in product profit driven by lower internal revenue; (4) due to the foregoing, Intel Foundry would not be a strong tailwind to Intel's IFS strategy; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times

### *March 28, 2024 Proxy Statement*

108.    On March 28, 2024, Intel filed the 2024 Proxy Statement with the SEC. Defendants Gelsinger, Goetz, Goldsmith, Henry, Ishrak, Lavizzo-Mourey, Liu, Novick, Smith, Tan, Weisler, and Yeary solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

109.    The 2024 Proxy Statement called for shareholder approval of, *inter alia*: (1) the reelection of Defendants Gelsinger, Goetz, Goldsmith, Henry, Ishrak, Lavizzo-Mourey, Liu,

Novick, Smith, Tan, Weisler, and Yeary to the Board; (2) the ratification of the appointment of

Ernst & Young LLP as the Company' independent registered public accounting firm for 2024; and

(3) the approval, on an advisory basis, of the executive compensation of certain Intel executive

officers.

110.    With respect to the Company's risk management oversight, the 2024 Proxy

Statement stated the following, in relevant part:

> The full Board has primary responsibility for enterprise risk management oversight.
> The Board executes its oversight duties through:
>
> - Assigning specific oversight duties to the Board committees based on their
>   areas of expertise and charter defined roles and responsibilities
> - Period briefing and informational sessions by management on:
>   - The types of risks the company faces
>   - Enterprise risk management, including risk-identification, mitigation and
>     control
>
> For most enterprise risk management issues, such as cybersecurity risks, the Board
> receives regular and detailed reports from management or the appropriate Board
> committee regarding its review of the issues. In some cases, such as for risks
> regarding new technologies and product acceptance, risk oversight is addressed as
> part of the full Board's regular oversight of strategic planning. The Board and its
> committees also assess whether management has an appropriate risk management
> framework to manage risks and whether that framework is operating effectively.

111.    Regarding the Code of Conduct, the 2024 Proxy Statement stated the following, in

relevant part:

> Our Code of Conduct applies to our non-employee directors with respect to their
> Intel-related activities, as well as to our officers, including our principal executive,
> principal financial, and principal accounting officers, or persons performing similar
> functions, and all other employees. We expect our directors, executives, and other
> employees to not engage in activities that compete with or are adverse to Intel, or
> that interfere with the proper performance of their duties or responsibilities to Intel,
> and to not use confidential company information, company assets, or their position
> at Intel for personal gain in violation of our policy. This includes avoiding any
> activity that is or has the appearance of being in conflict with Intel's interests.

112.    The 2024 Proxy Statement was materially false and misleading because it failed to

disclose that, contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight

function and Defendants' adherence to the Code of Conduct, the Board and its committees were not adequately exercising these functions, as Defendants were causing and/or permitting the Company to issue false and misleading statements and were not complying with the Code of Conduct.

113.    Additionally, the 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) (1) IFS's growth was not indicative of revenue growth reportable under the Intel Foundry segment; (2) Intel Foundry experienced substantial operating losses in 2023; (3) Intel Foundry experienced a decline in product profit driven by lower internal revenue; (4) due to the foregoing, Intel Foundry would not be a strong tailwind to Intel's IFS strategy; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

114.    As a result of Defendants Gelsinger, Goetz, Goldsmith, Henry, Ishrak, Lavizzo-Mourey, Liu, Novick, Smith, Tan, Weisler, and Yeary causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Gelsinger, Goetz, Goldsmith, Henry, Ishrak, Lavizzo-Mourey, Liu, Novick, Smith, Tan, Weisler, and Yeary to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

## The Truth Emerges

### *April 2, 2024 Press Release*

115.    On April 2, 2024, the Company released the April 2nd Press Release after the markets closed, which contained a "retrospective revision to Item 7 of Intel Corporation's Annual Report on Form 10-K 'Management's Discussion and Analysis of Financial Condition and Results of Operations' for the year ended December 30, 2023, as originally filed with the SEC on January 26, 2024."

116.    In the April 2nd Press Release, the Company revealed that Intel Foundry's real operating losses were ***approximately $7 billion*** on sales of $18.9 billion for the 2023 Fiscal Year. Further, the Company revealed that Intel Foundry's internal revenue for the 2023 Fiscal Year was $18.9 billion down $8.6 billion from 2022. These representations signaled to investors that there was a lower product profit driven by lower internal revenue.

117.    The retrospective revision appeared in the April 2, 2024 Press Release as follows:

We previously announced the implementation of our internal foundry operating model, which took effect in the first quarter of 2024, and creates a foundry relationship between our Intel Products business (collectively CCG, DCAI, and NEX) and our Intel Foundry business.

* * *

Our internal foundry model is a key component of our strategy and is designed to reshape our operational dynamics and drive greater transparency, accountability, and focus on costs and efficiency.



118.    On this news, Intel's stock price fell approximately 8.2% per share, or $3.61, from a closing price of $43.94 per share on April 2, 2024 to close at $40.33 per share on April 3, 2024, on unusually heavy trading.

***April 25, 2024 Q1 2024 10-Q***

119.    The truth fully emerged on April 25, 2024, when the Company released the Q1 2024 10-Q financial results. In the Q1 2024 10-Q, Defendants represented that Intel Foundry reported revenue results for the quarter of approximately $4.4 billion, reflecting a 10% decline compared to the same quarter in 2023.

120.    On this news, Intel's stock price fell approximately 9.2% per share, or $3.23, from a closing price of $35.11 per share on April 25, 2024 to close at $31.88 per share on April 26, 2024, on unusually heavy trading.

## DAMAGES TO INTEL

121.    As a direct and proximate result of the Individual Defendants' conduct, Intel has lost and expended, and will continue to lose and expend, many millions of dollars.

122.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

123.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

124.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

125.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

126.    As a direct and proximate result of the Individual Defendants' conduct, Intel has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendant's breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

127.    Plaintiff brings this action derivatively and for the benefit of Intel to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Intel, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

128.    Intel is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

129.    Plaintiff is, and has been at all relevant times, a shareholder of Intel. Plaintiff will adequately and fairly represent the interests of Intel in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

130.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

131.    A pre-suit demand on the Board of Intel is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following thirteen individuals: Defendants Gelsinger, Goetz, Goldsmith, Henry, Ishrak, Lavizzo-Mourey, Liu, Novick, Smith, Tan, Weisler, and Yeary ("Director Defendants"), along with non-party Stacy Smith (together with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to seven of thirteen Directors who are on the Board at the time this action is commenced.

132.    Demand is excused as to all the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts. This renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

133.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended, *inter alia,* to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

134.    Additional reasons that demand on Defendant Gelsinger is futile follow. Defendant Gelsinger has served as the Company's CEO and as a Company director since February 2021. As such, the Company provides Defendant Gelsinger with his principal occupation for which he receives lucrative compensation. In the 2023 Fiscal Year alone, Defendant Gelsinger received

$16,855,400 in total compensation from the Company. Thus, as the Company admits, he is not independent. As CEO throughout the Relevant Period, Defendant Gelsinger was ultimately responsible for the issuance of all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period. Moreover, Defendant Gelsinger signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein as well as the SOX certifications attesting to its accuracy. He also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to the re-election of all Director Defendants and non-party Stacy Smith, to the Board. As the Company's highest officer and a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Gelsinger is a defendant in the Securities Class Action. For these reasons, too, Defendant Gelsinger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.    Additional reasons that demand on Defendant Goetz is futile follow. Defendant Goetz has served as a Company director since November 2019. He also serves as a member of the Talent and Compensation Committee and the M&A Committee. Defendant Goetz received and continues to receive handsome compensation for his role as a director, including $374,400 in 2023. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Goetz signed, and thus personally made, the

false and misleading statements in the 2023 10-K referenced herein. He also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, too, Defendant Goetz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

136.    Additional reasons that demand on Defendant Goldsmith is futile follow. Defendant Goldsmith has served as a Company director since September 2021 and serves as a member of the Audit & Finance Committee. Defendant Goldsmith received and continues to receive handsome compensation for her role as a director, including $297,600 in 2023. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Goldsmith signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. She also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to her re-election to the Board, as alleged above. For these reasons, too, Defendant Goldsmith breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

137.    Additional reasons that demand on Defendant Henry is futile follow. Defendant Henry has served as a Company director since January 2020 and serves as a member of the Talent and Compensation Committee and the M&A Committee. Defendant Henry received and continues to receive handsome compensation for her role as a director, including $372,100 in 2023. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the

Company to make false and misleading statements, consciously disregarded her duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Henry signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. She also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to her re-election to the Board, as alleged above. For these reasons, too, Defendant Henry breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

138.    Additional reasons that demand on Defendant Ishrak is futile follow. Defendant Ishrak has served as a Company director since March 2017. He also serves as a member of the Audit & Finance Committee, as a member of the Corporate Governance and Nominating Committee, and served as the former Chair of the Board from January 2020 until January 2023. Defendant Ishrak received and continues to receive handsome compensation for his role as a director, including $339,700 in 2023. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Ishrak signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. He also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board. For these reasons, too, Defendant Ishrak breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

139.    Additional reasons that demand on Defendant Lavizzo-Mourey is futile follow. Defendant Lavizzo-Mourey has served as a Company director since March 2018 and serves as a member of the Talent and Compensation Committee and as the Chair of the Corporate Governance and Nominating Committee. Defendant Lavizzo-Mourey received and continues to receive handsome compensation for her role as a director, including $327,600 in 2023. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Lavizzo-Mourey signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. She also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to her re-election to the Board, as alleged above. For these reasons, too, Defendant Lavizzo-Mourey breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

140.    Additional reasons that demand on Defendant Liu is futile follow. Defendant Liu has served as a Company director since July 2016 and serves as a member of the Corporate Governance and Nominating Committee. Defendant Liu received and continues to receive handsome compensation for her role as a director, including $282,600 in 2023. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Liu signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. She also solicited the 2024 Proxy

Statement, which contained material misrepresentations and omissions and contributed to her re-election to the Board, as alleged above. For these reasons, too, Defendant Liu breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

141.    Additional reasons that demand on Defendant Novick is futile follow. Defendant Novick has served as a Company director since December 2022 and serves as a member of the Audit & Finance Committee and as a member of the Corporate Governance and Nominating Committee. Defendant Novick received and continues to receive handsome compensation for her role as a director, including $389,600 in 2023. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Novick signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. She also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to her re-election to the Board, as alleged above. For these reasons, too, Defendant Novick breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

142.    Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since March 2017 and serves as Chair of the Audit & Finance Committee. Defendant Smith received and continues to receive handsome compensation for his role as a director, including $319,600 in 2023. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading

statements, consciously disregarded his duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Smith signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. He also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, too, Defendant Smith breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

143.    Additional reasons that demand on Defendant Tan is futile follow. Defendant Tan has served as a Company director since September 2022. He also serves as a member of the M&A Committee and is a former member of Intel's Technical Advisory Committee. According to the 2024 Proxy Statement, "Lip-Bu Tan, a non-employee director nominee, served as a member of [the Board's Technical Advisory Committee] prior to joining the Board and currently does not satisfy the Nasdaq independence test due to compensation previously received in that role." Defendant Tan received and continues to receive handsome compensation for his role as a director, including $791,500 in 2023. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Tan signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. He also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, too,

Defendant Tan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

144.    Additional reasons that demand on Defendant Weisler is futile follow. Defendant Weisler has served as a Company director since June 2020 and serves as Chair of the Talent and Compensation Committee and as a member of the M&A Committee. Defendant Weisler received and continues to receive handsome compensation for his role as a director, including $409,500 in 2023. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Weisler signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. He also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, too, Defendant Weisler breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

145.    Additional reasons that demand on Defendant Yeary is futile follow. Defendant Yeary has served as a Company director since March 2009. He has also served as the Chair of the Board since January 2023, as a member of the Corporate Governance and Nominating Committee, and as Chair of the M&A Committee. Defendant Yeary received and continues to receive handsome compensation for his role as a director, including $452,100 in 2023. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duty to

protect corporate assets. Moreover, Defendant Yeary signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. He also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, too, Defendant Yeary breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

146.    Additional reasons that demand on the Board is futile follow.

147.    Director Defendants Smith (as Chair), Goldsmith, Ishrak, and Novick served on the Company's Audit Committee during the Relevant Period (the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. The Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the investing public, and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Audit Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

148.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, supporting and profiting from unethical behavior, failing to avoid conflicts of interest, engaging in insider trading, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

149.    Intel has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Intel any part of the damages Intel suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

150.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of

exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

151.    The acts complained of herein constitute violations of fiduciary duties owed by Intel's officers and directors, and these acts are incapable of ratification.

152.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Intel. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Intel, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

153.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Intel to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

154.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least seven of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

155.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

157.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

158.    Under the direction and watch of the Director Defendants, the 2024 Proxy Statement failed to disclose that, contrary to its assertions, the Board and its committees were not adequately exercising their risk oversight functions and were causing, or permitting, the Company to issue false and misleading statements and were not complying with the Code of Conduct.

159.    The 2024 Proxy Statement also failed to disclose that: (1) IFS's growth was not indicative of revenue growth reportable under the Intel Foundry segment; (2) Intel Foundry experienced substantial operating losses in 2023; (3) Intel Foundry experienced a decline in product profit driven by lower internal revenue; (4) due to the foregoing, Intel Foundry would not be a strong tailwind to Intel's IFS strategy; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

160.    In the exercise of reasonable care, the Individual Defendants knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to, the election of directors.

161.    The false and misleading elements of the 2024 Proxy Statement led Company shareholders to, *inter alia,* (1) elect Defendants Gelsinger, Goetz, Goldsmith, Henry, Ishrak, Lavizzo-Mourey, Liu, Novick, Smith, Tan, Weisler, and Yeary to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2024; and (3) approve, on an advisory basis, the executive compensation of certain Intel executive officers.

162.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

163.    Plaintiff on behalf of Intel has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

164.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

165.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Intel's business and affairs.

166.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

167.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Intel.

168.    In breach of their fiduciary duties owed to Intel, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) IFS's growth was not indicative of revenue growth reportable under the Intel Foundry segment; (2) Intel Foundry experienced substantial operating losses in 2023; (3) Intel Foundry experienced a decline in product profit driven by lower internal revenue; (4) due to the foregoing, Intel Foundry would not be a strong tailwind to Intel's IFS strategy; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

169.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

170.     Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

171.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to timely correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

172.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Intel's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

173.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

174.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Intel has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

175.     Plaintiff on behalf of Intel has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

176.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Intel.

178.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Intel that was tied to the performance or artificially inflated valuation of Intel, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

179.    Plaintiff, as a shareholder and representative of Intel, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

180.    Plaintiff on behalf of Intel has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

181.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the

Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

183.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

184.    Plaintiff on behalf of Intel has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Abuse of Control

185.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Intel, for which they are legally responsible.

187.    As a direct and proximate result of the Individual Defendants' abuse of control, Intel has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

188.    Plaintiff on behalf of Intel has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Gross Mismanagement

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Intel in a manner consistent with the operations of a publicly held corporation.

191.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Intel has sustained and will continue to sustain significant damages.

192.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

193.    Plaintiff on behalf of Intel has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Intel, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Intel;

(c)    Determining and awarding to Intel the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Intel and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Intel and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the board;

       2. a provision to permit the shareholders of Intel to nominate at least seven candidates for election to the Board; and

       3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

       (e)     Awarding Intel restitution from Individual Defendants, and each of them;

       (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

       (g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 31, 2024

Respectfully submitted,

**FARNAN LLP**

Of Counsel:

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)

**THE BROWN LAW FIRM, P.C.**
Michael J. Farnan (Bar No. 5165)
Timothy Brown
919 N. Market St., 12th Floor
767 Third Avenue, Suite 2501
Wilmington, DE 19801
New York, NY 10017
Telephone: (302) 777-0300
Telephone: (516) 922-5427
Facsimile: (302) 777-0301
Facsimile: (516) 344-6204
Email: bfarnan@farnanlaw.com
Email: tbrown@thebrownlawfirm.net
Email: mfarnan@farnanlaw.com

*Attorneys for Plaintiff*